# EXHIBIT A

10/2/2014

# OPERATING AGREEMENT

## OF

Brexstone LLC



EXHIBIT

A

# TABLE OF CONTENTS

Page

**ARTICLE 1    DEFINITIONS** ........................................................................................... 1

**ARTICLE 2    FORMATION** ............................................................................................ 1
    Section 2.1    Organization ....................................................... 1
    Section 2.2    Agreement ........................................................... 1
    Section 2.3    Articles to Govern ............................................. 1
    Section 2.4    Name ..................................................................... 1
    Section 2.5    Character of Business ....................................... 2
    Section 2.6    Term ..................................................................... 2
    Section 2.7    Registered Agent and Office ........................... 2
    Section 2.8    Principal Office ................................................. 2

**ARTICLE 3    ACCOUNTING AND RECORDS** ............................................................ 2
    Section 3.1    Records to be Maintained ............................... 2
    Section 3.2    Reports to Members ......................................... 3
    Section 3.3    Capital Accounts .............................................. 4
    Section 3.4    Company Account ............................................ 4
    Section 3.5    Inspection ........................................................... 4
    Section 3.6    Fiscal Year ......................................................... 4

**ARTICLE 4    NAMES AND ADDRESSES OF MEMBERS** ............................................ 4

**ARTICLE 5    RIGHTS AND DUTIES OF MEMBERS** .................................................. 4
    Section 5.1    Management Rights ........................................... 4
    Section 5.2    Meetings .............................................................. 4
    Section 5.3    Annual Meetings ............................................... 4
    Section 5.4    Special Meetings ............................................... 5
    Section 5.5    Notice ................................................................... 5
    Section 5.6    Waiver of Notice .............................................. 5
    Section 5.7    Proxies ................................................................. 5
    Section 5.8    Majority .............................................................. 6
    Section 5.9    Liability of Members ....................................... 6
    Section 5.10    Representations and Warranties ................... 6
    Section 5.11    Conflicts of Interest ........................................ 6

**ARTICLE 6    MANAGEMENT** ....................................................................................... 7
    Section 6.1    Managing Members .......................................... 7
    Section 6.2    General Powers .................................................. 7
    Section 6.3    Acts Which Require Unanimous Consent
                   of Members ......................................................... 8

| | | |
|---|---|---|
| Section 6.4 | Compensation of Manager | 9 |
| Section 6.5 | Compensation of Members | 9 |
| Section 6.6 | Members' Standard Care | 9 |

**ARTICLE 7    CONTRIBUTIONS AND CAPITAL ACCOUNTS** .................................. 10

| | | |
|---|---|---|
| Section 7.1 | Capital Contributions | 10 |
| Section 7.2 | Capital Calls | 10 |
| Section 7.3 | Adjustment of Membership Interests | 10 |
| Section 7.4 | Maintenance of Capital Accounts | 10 |
| Section 7.5 | Sale or Exchange of Interest | 11 |
| Section 7.6 | Compliance with Section 704(b) of the Code | 11 |

**ARTICLE 8    ALLOCATIONS AND DISTRIBUTIONS** .................................. 11

| | | |
|---|---|---|
| Section 8.1 | Allocations of Net Profits and Net Losses from Operations | 11 |
| Section 8.2 | Interim Distributions | 11 |
| Section 8.6 | Limitations on Distributions | 11 |

**ARTICLE 9    TAXES** .................................. 12

| | | |
|---|---|---|
| Section 9.1 | Elections | 12 |
| Section 9.2 | Taxes of Taxing Jurisdictions | 12 |
| Section 9.3 | Tax Matters Member | 12 |

**ARTICLE 10    DISPOSITION OF MEMBERSHIP INTERESTS** .................................. 12

| | | |
|---|---|---|
| Section 10.1 | Disposition | 12 |
| Section 10.2 | Dispositions not in Compliance with this Article Void | 13 |
| Section 10.3 | Disenchanted Member | 13 |
| Section 10.4 | Involuntary Withdrawal | 14 |
| Section 10.5 | Appraised Value | 15 |

**ARTICLE 11    ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS** .......... 15

| | | |
|---|---|---|
| Section 11.1 | Rights of Assignees and Assigning Members | 15 |
| Section 11.2 | Admission of Substitute Members | 15 |
| Section 11.3 | Admission of Additional Members | 16 |

**ARTICLE 12    DISSOLUTION AND WINDING UP** .................................. 16

| | | |
|---|---|---|
| Section 12.1 | Dissolution | 16 |
| Section 12.2 | Continuation of Business Upon Dissolution | 16 |
| Section 12.3 | Effect of Dissolution | 17 |
| Section 12.4 | Distribution of Assets on Dissolution | 17 |

      Section 12.5      Winding Up and Certificate
                               of Dissolution ............................................................................ 17

**ARTICLE 13    DEADLOCKS** ............................................................ 17

**ARTICLE 14    AMENDMENT OR MODIFICATION OF**
                  **OF AGREEMENT** .................................................. 18

**ARTICLE 15    MISCELLANEOUS PROVISIONS** ............................................ 18
      Section 15.1      Entire Agreement ................................................ 18
      Section 15.2      Rights of Creditors and
                            Third Parties under Agreement ........................... 18
      Section 15.3      Counterpart Execution ....................................... 18

**GLOSSARY** ............................................................................. 20

**EXHIBITS**

## OPERATING AGREEMENT

### OF

Barestone, LLC

THIS OPERATING AGREEMENT of _Barestone LLC_, an Ohio limited liability company organized pursuant to Chapter 1705 of the Ohio Revised Code, is entered into and shall be effective as of the Effective Date by and among the Company and the persons executing this Agreement as Members.

## ARTICLE 1
## DEFINITIONS

Capitalized terms used herein without specific definition shall have the meanings respectively ascribed thereto in the Glossary appended to this Agreement.

## ARTICLE 2
## FORMATION

Section 2.1. **Organization** - The Members hereby ratify the Articles of Organization and the Original Appointment of Agent that have been filed with the Secretary of State of Ohio. Pursuant to these filings, the Members hereby organize the Company as an Ohio limited liability company pursuant to the provisions of the Act. The Members shall take such action as may be required to effect any related securities or any other filings required under applicable law.

Section 2.2. **Agreement** - For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended according to its terms, and subject to the terms set out in the Articles. It is the express intention of the Members that the Agreement shall be the sole source of agreement. To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be considered amended to the least degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

Section 2.3 **Articles to Govern** - In the event of an inconsistency between the Articles of the Company and the Agreement, the Articles shall govern.

Section 2.4. **Name** - The name of the Company is _Barestone LLC_ and all business of the Company shall be conducted under that name or under any other name

determined by the Members to be appropriate, but in any case only to the extent permitted by applicable law.

Section 2.5. **Character of Business** - The Company may engage in any lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business, including, without limitation, the development, management, and ownership of real estate. The Company shall have the authority to do all things necessary and permissible by law to accomplish its purpose and operate its business. The authority granted to the Members hereunder to bind the Company shall be limited to actions necessary or convenient to such business.

Section 2.6. **Term** - The term of the Company shall commence on the Effective Date and shall continue until September  30  , 2044, unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.

Section 2.7. **Registered Agent and Office** - The registered agent for the service of process and the registered office shall be Bair Properties, LLC; 114 E 13th, Suite 1F. The Members, may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State of Ohio. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Members shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

Section 2.8. **Principal Office** - The Principal Office of the Company shall be located at 114 E 13th St, Suite 1F, or such other address and place as shall be determined by the Members.

## ARTICLE 3
## ACCOUNTING AND RECORDS

Section 3.1. **Records to be Maintained** - The Company shall maintain the following records at the Principal Office:

(a) A current list of the full names, in alphabetical order, and last known business or residence address of each Member;

(b) A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any Articles have been executed;

(c) Copies of the Company's federal, foreign, state and local income tax returns and reports, if any;

(d) A copy of the Agreement, including all amendments thereto, and executed copies of any written powers of attorney pursuant to which the Agreement or any amendment may have been executed;

(e)  Any financial statements of the Company for the three (3) most recent years or for such shorter period of time as the Company shall have been in existence;

(f)  Unless contained elsewhere herein, a writing setting forth the following:

(i)  the date on which each Member became a Member and the amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future; and

(ii)  the times at which or events on the happening of which any additional Commitments agreed to be made by each Member, if any, are to be made; and

(iii)  any right of a Member to receive, or of the Company to make, distributions to a Member  which include a return of all or any part of the Member's Capital Contribution; and,

(iv)  any events upon the happening of which the Company is to be dissolved and its affairs wound up.

(g)  Any written consents obtained from Members pursuant to the Act regarding action taken by Members without a meeting; and,

(h)  Copies of any agreement pursuant to Section 9.2 hereof of each Member who is not a resident of Ohio to file an Ohio Income Tax Return in accordance with the provisions of the Ohio Revised Code and to make timely payment of all taxes imposed on him by the State of Ohio with respect to the income of the Company and to be subject to personal jurisdiction in Ohio for purposes of the collection of such income taxes, together with related interest and penalties imposed upon the Member by the State of Ohio with respect to the Company's income; and

(i)  minutes of every meeting of the Members; and

(j)  any other information regarding the affairs of the Company that the Members may determine is reasonable.

Section 3.2.  **Reports to Members** - The Managing Member shall prepare or have prepared, within ninety (90) days after the end of the Company's fiscal year: (i) complete financial statements of the Company including a balance sheet as of the end of such year and a profit and loss statement for such year; and (ii) such information and reports as shall enable each Member to comply with all federal, state and local income tax laws and reporting requirements applicable to each such Member.

3

Section 3.3. **Capital Accounts** - The Company shall maintain a record of Capital Account for each Member and Assignee in accordance with Article 7.

Section 3.4. **Company Account** - All funds of the Company shall be deposited in its name in a bank checking account or other account that shall be designated by the Members.

Section 3.5. **Inspection** - All documents required to be maintained at the Principal Office pursuant to Section 3.1, as well as true and full information regarding the state of the Company's business, financial condition and other information regarding the affairs of the Company shall be made available upon reasonable demand for any purpose reasonably related to the Member's interest as a Member, during ordinary business hours for inspection and copying at the expense of any Member.

Section 3.6. **Fiscal Year** - The fiscal year of the Company shall be the twelve (12) calendar month period ending on December 31 in each year, except that the first year of the Company shall be that period (even if less than twelve months) beginning on the Effective Date and ending on the next following December 31, and the final year of the Company shall be that period beginning on the first day of such year and ending on the date of cancellation of the Articles.

## ARTICLE 4
### NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Initial Members are as reflected on **Exhibit A** attached hereto and by this reference made a part hereof as if set forth fully herein.

## ARTICLE 5
### RIGHTS AND DUTIES OF MEMBERS

Section 5.1. **Management Rights** - All Members, exclusively in their capacity as Members, shall be entitled to participate in the management of the Company and vote on any matter submitted to a vote of the Members. All actions requiring the consent or approval of the Members or remaining Members, as the case may be, including, but not limited to, any amendment to this Agreement or the continuation of the Company after a Dissolution Event shall require the consent or approval of all of the Members or remaining Members, except as otherwise provided herein. Where a provision in the Agreement requires the consent or vote of the Members, it excludes the consent or vote of Assignees.

Section 5.2 **Meetings** - Meetings of the Members shall be held each year at the Principal Office of the Company or at such other place either within or without Ohio as specified from time to time by a Majority of the Members.

Section 5.3 **Annual Meetings** - In the absence of a resolution of the Members providing otherwise, the annual meeting of the Members of the Company for the transaction of

such business as may properly come before the meeting, shall be held during the first week of April at a place to be determined by the Members of each fiscal year, if the same be not a legal holiday, and if a legal holiday in the State of Ohio, then on the next succeeding Business Day or on any other date agreed to by a Majority of the Members. Failure to hold the annual meeting at the designated time shall not work a forfeiture or dissolution of the Company.

Section 5.4 **Special Meetings** - Special meetings may be called upon the request of any Members then entitled to vote at the meeting.

Section 5.5 **Notice** -

(A) Notice stating the place, day and hour of the meeting and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be given to each Member entitled to vote at such meeting not less than ten (10) days nor more than one hundred and twenty (120) days before the date of the meeting by or at the direction of any person calling the meeting to each Member of record entitled to vote at such meeting.

(B) Notice to Members of record, if mailed, shall be deemed delivered as to any Member when deposited in the United States mail, addressed to the Member with postage prepaid, but, if three (3) successive letters mailed to the last-known address of any Member are returned as undeliverable, no further notices to such Member shall be necessary until another address for such Member is made known to the Company.

Section 5.6 **Waiver of Notice** -

(A) When any Notice is required to be given to any Member under the provisions of the Act or under the provisions of the Articles or this Agreement, a waiver thereof in writing signed by the person entitled to such Notice, whether before, at, or after the time stated herein, shall be equivalent to the giving of such Notice.

(B) By attending a meeting, a Member:

(i) Waives objection to lack of Notice or defective Notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transaction of business at the meeting;

(ii) Waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting Notice unless the Member objects to considering the matter when it is presented.

Section 5.7. **Proxies** - At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be

5

valid after three (3) months from the date of its execution, unless otherwise provided in the proxy.

Section 5.8   **Majority** - Whenever any matter is required or allowed to be approved by a Majority of the Members or a Majority of the remaining Members under the Act or the Agreement, such matter shall be considered approved or consented to upon the receipt of the affirmative approval or consent, either in writing or at a meeting of the Members, of Members (1) having an interest in the Net Profits of the Company in excess of fifty percent (50%) of the interest in the Net Profits of the Company of all Members entitled to vote on a particular matter and (2) whose Capital Accounts constitute more than fifty percent (50%) of all of Member's Capital Accounts who are entitled to vote on a particular matter.   Assignees shall not be considered Members entitled to vote.  In the case of a Member who has Disposed of all of or a portion of that Member's Membership Interest (excluding the Member's right to participate in the management of the Company) to an Assignee, the interest in the Net Profits and the Capital Account of such Assignee shall be considered in determining a Majority and such Disposing Member's vote or consent shall be determined by such profits interest and capital interest.

Section 5.9   **Liability of Members** - Unless the Members otherwise agree, no Member shall be liable for the liabilities of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

Section 5.10   **Representations and Warranties** - Each Member and, in the case of an Organization, the person(s) executing the  Agreement on behalf of the Organization, hereby represents and warrants to the Company and each other Member that: (a) if that Member is an Organization, that it is duly organized, validly existing and in good standing under the law of its state of organization and that it has full organizational power to execute, deliver and perform its obligations hereunder; (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest; (c) the Member is aware that no market may exist for the resale of the Member's interest in the Company; (d) the Member is aware of any and all restrictions imposed by the Company on the further distribution of the Member's interest in the Company, including, as applicable, but not limited to, any restrictive legends appearing on a certificate issued to the Member, holding periods, stop transfer orders, or buy-back rights of the Company or the holders of the interests in the Company; and (e) the Member acknowledges that the interests have not been registered under the Securities Act of 1933 or any state securities laws and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

Section 5.11   **Conflicts of Interest** -

(A) A Member shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the

Company, it being expressly understood that some of the Members may enter into transactions that are similar to the transactions into which the Company may enter.

(B) A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if any of the following apply: (i) the transaction is fair to the Company at the time it is authorized or approved by the Members; (ii) the disinterested Members knowing the material facts of the transaction and the Member's interest, authorize or approve the transaction by a majority in number of such disinterested Members even though the disinterested Members constitute less than a quorum of the Members; or (iii) the disinterested Members, knowing the material facts of the transaction and the Member's interest, authorize and approve the transaction by the affirmative vote of such disinterested Members entitled to exercise a Majority.

## ARTICLE 6
## MANAGEMENT

Section 6.1   **Managing Members** - The Company shall be managed by a Managing Member who may, but need not, be a member. Bair Properties, LLC is hereby designated to serve as the initial Managing Member.

Section 6.2   **General Powers** - The Managing Member shall have full, exclusive and complete discretion, power and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the day-to-day business and affairs of the Company for the purposes herein stated and to make all decisions affecting such day-to-day operations of the Company, including but not limited to:

(a) the conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company within or without the State of Ohio;

(b) to employ from time to time persons, firms or corporations for the operation and management of the Company business, including but not limited to attorneys, accountants, contractors, advisors, supervisory and managing agents and financial agents on such terms and for such compensation as the Members may determine;

(c) to perform any and all other acts or activities customary or incidental to the business purposes of the Company and to execute on behalf of the Company any and all instruments or documents which have been determined by the Members to be needed to effectuate the business purposes of the Company and the foregoing policies;

7

(d)  approve of the Project development plan and yearly Project Budgets which shall include an economic proforma and an analysis of the status of the Project;

(e)  obtain and approve of all financing for the Project including construction and permanent financing;

(f)  determine any substantial changes to the Project;

(g)  approve of construction contracts;

(h)  making capital calls in accordance with Article 7;

(i)  determine whether to proceed with additional phases of the Project, which phases shall be defined as follows:

i.  Due Diligence Phase: the Company will obtain access or title to the Property and perform any necessary interior demotion and site cleanout.

ii.  Marketable Design Phase: the Company will create several proposed uses for the Property and solicit market feedback for those proposed uses by exposing the Property to the open market.

iii.  Construction Phase: the Company will finalize the use of the Property, enter into a purchase agreement with a consumer for the Property, obtain financing to construct the improvements, and commence construction.

Section 6.3   **Acts Which Require Unanimous Consent of Members** - The unanimous vote of the Members is required for the Company to act in the following fashion:

(a)  The lending of money, investment and reinvestment of the Company's funds, and receipt and holding of Property as security for repayment, including, without limitation, the loaning money to, and otherwise helping Members, officers, employees and agents;

(b)  the sale, conveyance, mortgage, pledge, lease, exchange and other Dispositions of Property;

(c)  The making of donations to the public welfare or for religious, charitable, scientific, literary or educational purposes;

(d)  The purchase of insurance on the life of any of its Members or employees;

8

(e) The participation by the Company in partnership agreements, joint ventures or other associations of any kind with any person or persons; and

(f) The indemnification of any other Person.

Section 6.4  **Compensation of the Manager** – The Manager shall be paid only such fees and compensation for services rendered to the Company as a Majority of the Members may approve. However, the Manager shall cause the following fees to be paid during the development of a Project to Bair Properties, LLC or its designee:

(a) A construction management fee equal to 11% of total construction costs for development of the Project. This fee will be paid on a monthly basis as construction progresses consistent with the preliminary proforma attached as **Exhibit C**.

(b) A fee of $0.00 per unit sold to a third party paid upon the closing of such unit.

(c) An organization / planning fee in the amount of $0.00 to be paid in the first 120 days after acquisition of the Project.

Section 6.5  **Compensation of Members** - Each Member shall be reimbursed for all expenses not exceeding $100.00 that are reasonably incurred on behalf of the Company and each Member may be entitled to compensation in an amount to be determined from time to time by a Majority of the Members. For those expenses exceeding $100.00 that are reasonably incurred on behalf of the Company, Members shall be reimbursed only upon the unanimous consent of the Members.

Section 6.6  **Members' Standard of Care** - A Member shall perform his duties as a Member in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances. In discharging his duties, a Member shall be fully protected in relying in good faith upon the records required to be maintained under Article 3 and upon such information, opinions, reports or statements by any of its other Members, officers or employees of the Company, who the Member reasonably believes are reliable and competent in the matters prepared or presented, or by any other Person, as to matters the Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid.

9

## ARTICLE 7
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 7.1    **Capital Contributions** - Within ten (10) days of the Effective Date, each Initial Member shall make the Capital Contribution described for that Member on **Exhibit A** and shall perform that Member's Commitment. The value of the Capital Contributions shall be as set forth on **Exhibit A**. No interest shall accrue on any Capital Contribution and no Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in this Agreement. The anticipated, initial Capital Contribution is intended to cover the Due Diligence Phase and Marketable Design Phase of the Project, as those phases are defined in Section 6.2(i)(i) and (ii). Assuming the Managing Member decides that the Company will proceed to the Construction Phase of the Project, it is anticipated that the Managing Member will make a Captial Call, pursuant to Section 7.2 and consistent with the preliminary proforma attached as **Exhibit C**.

Section 7.2    **Capital Calls** - The aggregate capital of the Company shall be increased, from time to time, as may be determined necessary by the Managing Member to satisfy on a timely basis the financial obligations and carry on the current business of the Company in accordance with the approved Budget for the Project (such increase being hereafter referred to as a "Capital Call"). In the event of a Capital Call, the Members shall make additional Capital Contributions to the Company in proportion to their respective Sharing Ratios. Assignees shall not be entitled to make contributions to the Company in the event of a Capital Call.

Section 7.3    **Adjustment of Membership Interests** - In the event any Member fails to contribute to the Company its initial Capital Contribution or its share of any Capital Contribution pursuant to a Capital Call, then the other Members shall be permitted (but not required) to make such contribution to the capital of the Company or admit Additional Member(s) in accordance with Section 11.3. In the event that the non-contributing Member does not repay the contributing Member(s) or Additional Member(s) within thirty (30) days from the date of such contribution, the Membership Interest of each Member, Additional Member, and Assignee shall be adjusted to be equal to the proportionate Membership Interest of each Member, Additional Member, and Assignee in the capital of the Company taking into account their respective Capital Accounts.

Section 7.4    **Maintenance of Capital Accounts** - The Company shall establish and maintain Capital Accounts for each Member and Assignee. An Assignee's initial Capital Account shall be that amount as determined in Section 7.5. As applicable, each Capital Account shall be (a) increased by (i) the amount of money actually contributed by the Member to the capital of the Company; and (ii) the Member's or Assignee's share of net Profits and of any separately allocated items of income or gain, and (b) decreased by: (i) the Member's or Assignee's share of Net Losses and of any Company deductions; and (ii) the amount of money actually distributed to such Member or Assignee by the Company.

10

Section 7.5   **Sale or Exchange of Interest** - In the event of a sale or exchange of some or all of a Member's Membership Interest in the Company, the Capital Account of the transferring Member shall become the Capital Account of the Assignee to the extent it relates to the portion of the Membership Interest transferred.

Section 7.6   **Compliance with Section 704(b) of the Code** - The provisions of this Article 7 as they relate to the maintenance of Capital Accounts are intended, and shall be construed and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article 8 to have substantial economic effect under the Regulations promulgated under §704(b) of the Code, in light of the distributions made pursuant to Articles 8 and 12 and of the Capital Contributions made pursuant to this Article 7. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the such Member's Commitment.

### ARTICLE 8
### ALLOCATIONS AND DISTRIBUTIONS

Section 8.1   **Allocations of Net Profits and Net Losses from Operations** - Except as may be required by §704(c) of the Code, and §§ 2, 3 and 4 of this Article 8, Net Profits, Net Losses and other items of income, gain, loss, deduction and credit shall be apportioned among the Members and Assignees in proportion to their Sharing Ratios.

Section 8.2   **Interim Distributions** - From time to time, a Majority of the Members may determine in their reasonable judgment to what extent, if any, the Company's cash on hand exceeds the current and anticipated needs, including, without limitation, needs for operating expenses, debt service, acquisitions, reserves and distributions to pay taxes. To the extent such excess exists and subject to Section 8.4, upon a vote of a Majority of the Members, distributions shall be made to the Members and Assignees in accordance with their Sharing Ratios. Such Distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by a Majority of the Members.

Section 8.3   **Managing Member Bonus Distribution** – Following the completion of the Project, should a Majority of the Members vote to make a distribution pursuant to Section 8.2 and should the Company realize a return on the Members' Capital Contributions in excess of forty percent (40%) (the "Target Return"), the cash on hand representing the profit in excess of the Target Return shall be distributed seventy-five percent (75%) to the Managing Member and the remainder to the Members and Assignees, including the Managing Member, in accordance with their Sharing Ratios.

Section 8.4   **Limitations on Distributions** - No Distribution shall be declared and paid unless, after the Distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members and Assignees on account of their Capital Accounts.

11

## ARTICLE 9
## TAXES

Section 9.1   **Elections** - The Members may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company.

Section 9.2   **Taxes of Taxing Jurisdictions** - To the extent that the laws of any Taxing Jurisdiction require, each Member requested to do so by the Members will execute an agreement in form and substance satisfactory to the Members, indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income and interest, and penalties assessed on such income. If the Member fails to provide such agreement, the Company may (but shall not be obligated to) withhold and pay over to such Taxing Jurisdiction the amount of tax due with respect to such income. Any such payments with respect to the income of a Member shall be treated as a Distribution for purposes of Article 8. The Company may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

Section 9.3   **Tax Matters Member** - Bair Properties, LLC is presently designated as the tax matters partner (hereinafter referred to as "Tax Matters Member") of the Company pursuant to §6231(a)(7) of the Code. Any Member designated as Tax Matters Member shall take such action as may be necessary to cause each other Member to become a notice partner within the meaning of §6223 of the Code. Any Member who is designated Tax Matters Member may not take any action contemplated by §§6222 through 6232 of the Code without the consent of a Majority of the Members.

## ARTICLE 10
## DISPOSITION OF MEMBERSHIP INTERESTS

10.1.   **Disposition** - In addition to any further requirements that may be contained in this Agreement, except for the transfer of a Member's right in the distributions (liquidation or otherwise) and allocations of the profits, losses, income, gain, deductions and credits of the Company, a Member may not dispose of all or any portion of his membership except as otherwise provided in this Agreement, and no Member's interest may be disposed of:

A.   If such disposition, alone or when combined with other transaction would result in the termination of the Company within the meaning of Section 7.08 of the Code; and

12

B.  Without an opinion of counsel satisfactory to the Members that such assignment is subject to an effective registration under, or exempt from the registration requirements of, applicable state and federal securities laws.

10.2    **Disposition Not in Compliance With This Article Void -**

Any attempt to disposition of a membership interests or any part thereof not in compliance with this Article is null and void.

10.3    **Disenchanted Member -**

(a)  If any Member becomes disenchanted in the continuation of the Company, notwithstanding the fact that he may be the sole dissenting Member, he shall have the privilege of offering to sell to the other Members on a pro rata basis his entire Company interest at a price determined by him and payable on such terms as he may determine provided, however, that such offer shall also contain an offer by him to purchase from all of the other Members their entire Company interests at the identical proportional price and on the same terms.  An offer so initiated by a Disenchanted Member shall state to the other Members that he is offering to sell his total Company interest at a fixed price and on stated terms or, at the option of the other Members, that he is offering to purchase from all of the other Members their total Company interest calculated at the same price and payable on the same stated terms but with the price adjusted in relation to the proportion that their total Company interests differs from his Company interest.  Such offer and notice from a Disenchanted Member shall be made in writing and sent to all of the other Members by certified mail, postage prepaid.  A mandatory condition of such offer shall be that any Member whose Company interest is acquired pursuant to the terms of this Article 10 shall be released from all personal liability on any Company loans or indebtedness then outstanding, including on any letters of credit, and it shall be the obligation of the acquiring Member or Members to secure such written release for a selling Member from the Company's lending institution.

(b)  Within sixty (60) days from receipt of such a notice from a Disenchanted Member the other Members shall then have the first option of deciding (i) whether they want to purchase the interest of the Disenchanted Member at the stated price and terms or (ii) whether they desire to sell their Company interests at the same proportionate price and on the same terms to him.

(c)  In the event all of the other Members elect to purchase the total Company interest from the Disenchanted Member, they shall so notify him in writing within said sixty (60) day period and within thirty (30) days thereafter such transaction shall be closed and consummated.  The acquiring Members shall be entitled to acquire the Company interest of the Disenchanted Member in such proportion so as to generally maintain consistent percentages of Company interests between them.

13

(d)  If some but not all of the Members desire to purchase the total Company interests of the Disenchanted Member, then the Member or Members who so desire to purchase can acquire the total Company interest of the Disenchanted Member upon giving notice within said sixty (60) day period and such transaction shall be closed and consummated within thirty (30) days thereafter.

(e)  In the event all of the Members elect to sell their total Company interest to the Disenchanted Member, they shall so notify the Disenchanted Member in writing within said sixty (60) day period and within thirty (30) days thereafter the Disenchanted Member shall be obliged to acquire all of their Company interests at the same proportionate price and on the same terms contained in his offer.

(f)  If following receipt of the initiating offer from the Disenchanted Member some of the other Members desire to sell their Company interests to him while other Members desire to purchase the Company interest of the Disenchanted Member, then those Members who desire to purchase shall be obliged to purchase not only the interest of the Disenchanted Member but also the interests of all other Members who expressed a desire to sell.  By reason of the foregoing whenever a Disenchanted Member sends his initiating offer, all other Members shall be obliged to respond in writing and by certified mail within the sixty (60) days period indicating whether they desire to sell their interests or purchase the interest of the Disenchanted Member and copies of such response shall be sent to all other Members also by certified mail.  A Member who fails to respond in writing within said sixty (60) day period shall be deemed to have elected to sell his Company interest.  The closing for the consummation of the purchase referred to in this Subparagraph (f) of this Section 10.3 shall occur within thirty (30) days from receipt of the last responding notice from any member.

(g)  No Member shall commence any action or initiate any legal proceeding to bring about a sale of his interest in the Company or to cause a dissolution of the Company unless and until he has first complied with all of the terms and provisions of this Article 10.

10.4  **Involuntary Withdrawal** -  Immediately upon the occurrence of an Involuntary Withdrawal (death, legal disability or bankruptcy), the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member.  If the Company is continued as provided for herein, the successor Interest Holder shall have all the rights of an Interest Holder but shall not be entitled to receive in liquidation of the Membership Interest, pursuant to Section 1705.12 of the Act, the fair market value of the Member's Membership Interest as of the date the Member involuntarily withdrew from the Company, but shall be entitled to the value provided for in Section 10.5.

The majority of remaining Members shall determine whether to liquidate the Company and shall provide notice of such liquidation within sixty (60) days from the date of Involuntary Withdrawal.  In lieu of liquidating the Company, the remaining Members shall have an opportunity to purchase the Member's interest who involuntarily withdrew in accordance with

14

the provisions of Section 10.5 herein. Such purchase shall occur within sixty (60) days of receipt of the Appraised Value established by Section 10.5.

10.5 **Appraised Value -**

10.5.1. The term "Appraised Value" means the appraised value of the equity of the Company's assets as hereinafter provided. Within fifteen (15) days after demand by either one or the other, the Company and the Withdrawing Member shall each appoint an appraiser to determine the value of the equity of the Company's Assets. The appraisers shall file their report within thirty (30) days of appointments. If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the equity value of the Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's assets and determine the value of the equity therein, and shall render a written report of his or her opinion thereon. Each party shall pay the fees and costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

10.5.2. The equity value contained in the joint written report of the initial appraisers or the written report of the third appraiser, as the case may be, shall be the Fair Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

## ARTICLE 11
## ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

Section 11.1 **Rights of Assignees and Assigning Members -** The Assignee of a Membership Interest has no right to participate in the management of the business and affairs of the Company or to become a Member, unless the Assignee is admitted as a Substitute Member. The Assignee is only entitled to receive, to the extent assigned, the Distributions of cash and other property and the allocations of profits, losses, income, gains, deductions, credits, or similar items to which the assigning Member would have been entitled. The assigning Member remains a Member and retains those rights the Assignee is not entitled to receive.

Section 11.2 **Admission of Substitute Members -** An Assignee of a Membership Interest shall be admitted as a Substitute Member and admitted to all the rights of the Member who initially assigned the Membership Interest only with the approval of a Majority of the Members. The Members may grant or withhold the approval of such admission for any reason in their sole and absolute discretion. If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interest. The admission of a Substitute Member, without more, shall not release the

15

Member originally assigning the Membership Interest from any liability to Company that may have existed prior to the approval.

Section 11.3 **Admission of Additional Members** - With the consent of a Majority of the Members, the Members may permit the admission of Additional Members. However, should a Member fail to contribute to the Company its initial Capital Contribution or its share of any Capital Contribution pursuant to a Capital Call, then the other Members shall be permitted to admit Additional Member(s) with the consent of a majority of those other, contributing Members.

## ARTICLE 12
## DISSOLUTION AND WINDING UP

Section 12.1 **Dissolution** - Unless otherwise provided for herein, the Company shall be dissolved and its affairs wound up, upon the first to occur of the following events (Dissolution Events):

(a) the expiration of the Term;

(b) the unanimous written agreement of all of the Members;

(c) the withdrawal of a Member;

(d) the death, insanity, bankruptcy, retirement, resignation, or expulsion of any Member;

(e) in the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f) in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(g) in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(h) in the case of a member that is an estate, the distribution by the fiduciary of the estate's entire interest in the company.

Section 12.2 **Continuation of Business Upon Dissolution** - Upon the occurrence of any Dissolution Event (except a Dissolution Event in accordance with Section 12.1, subparagraph (b) above), the Members of the Company shall continue the business of the Company upon the vote of a Majority of the Members or the remaining Members, as the case may be, of the Company to continue the business of the Company.

16

Section 12.3 **Effect of Dissolution** - Upon dissolution, the Company shall cease carrying on (as distinguished from the winding up of) the Company business, but the Company is not terminated and continues until the winding up of the affairs of the Company is completed and the certificate of dissolution has been issued by the Secretary of State of Ohio.

Section 12.4 **Distribution of Assets on Dissolution** - Upon the winding up of the Company, the Company Property shall be distributed:

(a) to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities; and,

(b) to Members and Assignees in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within sixty (60) days of the end of the Company's taxable year or, if later, within ninety (90) days after the date of liquidation. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by a Majority of the Members.

Section 12.5 **Winding Up and Certificate of Dissolution** - The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the Company have been distributed to the Members and Assignees. Upon the completion of winding up of the Company, a certificate of dissolution shall be delivered to the Secretary of State of Ohio for filing. The certificate of dissolution shall set forth the information required by the Act.

## ARTICLE 13
## DEADLOCKS

In the event that the Members are unable to reach agreement on a decision requiring their unanimous consent (such an inability herein defined as "Deadlock"), then, in such event, any Member may give written notice of the occurrence of such Deadlock to the other Member(s) and each shall have the respective rights set forth in this Article. Within fifteen (15) days after demand by any Member, each Member shall appoint an individual with proficiency in the subject matter in question to determine the appropriate course of action for the Company. If the appointees agree upon the appropriate course of action for the Company, they shall jointly render a single written report stating their determination. If the appointees cannot agree upon the Company's course of action, they shall render separate written reports and they shall jointly appoint an individual who shall review the reports of the initial appointees and any other information deemed appropriate in order to determine the appropriate course of action for the Company. Such individual shall render a written report of his or her opinion within fifteen (15) days of their appointment. The report shall be final. Each party shall pay the fees and costs of the individual appointed by that party and the fees and other costs of the jointly appointed individual shall be shared equally by the remaining parties.

E-FILED 09/08/2017 04:08 PM   /   CONFIRMATION 656319   /   A 1704728   /   COMMON PLEAS DIVISION   /   IFI

## ARTICLE 14
## AMENDMENT OR MODIFICATION OF AGREEMENT

The Agreement may be amended or modified from time to time only by a written instrument adopted and executed by a Majority of the Members; provided, however, that amendments to or modifications of any provision in the Agreement, which provision requires the unanimous consent of the Members, shall require the unanimous vote or consent of all of the Members to amend such provision in the Agreement.

## ARTICLE 15
## MISCELLANEOUS PROVISIONS

Section 15.1 **Entire Agreement** - The Agreement represents the entire agreement among all the Members and between the Members and the Company.

Section 15.2 **Rights of Creditors and Third Parties under Agreement** - The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

Section 15.3 **Counterpart Execution** - This Agreement may be executed in counterparts.

**IN WITNESS WHEREOF**, we have hereunto set our hand on the date set forth beside our names.

COMPANY                                      MEMBERS

, an Ohio limited liability company          BAIR PROPERTIES, LLC, an Ohio limited
                                             liability company

Name: _____                        Name: _David (DB) Bair_

Title: _Managing Member_                      Title: _Managing Member_

Date: _11/27/15_                              Date: _11/27/15_

18

KINGSTON DEVELOPMENT GROUP.
LLC, an Ohio limited liability company

Name: _____

Title: _____

Name: _Michael P. Carter_____

Title: _Owner_____

Date: _11/27/2015_____

19

E-FILED 09/08/2017 04:08 PM  /  CONFIRMATION 656319  /  A 1704728  /  COMMON PLEAS DIVISION  /  IFI

## GLOSSARY

For purposes of the Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

**Act** - Chapter 1705 of the Ohio Revised Code, Section 1705.01 et seq., and all amendments thereto.

**Additional Member** - A Member other than an Initial Member or a Substitute Member who has acquired a Membership Interest from the Company.

**Agreement** - This Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

**Articles** - The Articles of Organization of the Company as adopted and amended from time to time by the Members and filed with the Secretary of State of Ohio.

**Assignee** - A transferee of a Membership Interest who is only entitled to receive, to the extent assigned, the Distribution of cash and other Property and the allocation of profits, losses, income, gains, deductions, credits, or similar items and who has not been admitted as a Substitute Member. An Assignee has no right to participate in the management of the business and affairs of the Company or to become a Member, unless the Assignee is admitted as a Substitute Member.

**Budget** - The business plan adopted by the Managing Member in connection with the Project.

**Business Day** - Any day other than Saturday, Sunday or any legal holiday observed in the State of Ohio.

**Capital Account** - The account maintained for a Member or Assignee determined in accordance with Article 7.

**Capital Contribution** - The gross amount of investment by a Member or all Members, as the case may be, which may consist of cash, Property, services rendered, promissory note or any other binding obligation to contribute cash or Property or to perform services.

**Code** - The Internal Revenue Code of 1986, as amended from time to time.

**Commitment** - The Capital Contributions that a Member is obligated to make.

**Company** - Bavastone LLC, an Ohio limited liability company formed under the laws of Ohio, and any successor limited liability company.

20

**Company Liability** - Any enforceable debt or obligation for which the Company is liable or which is secured by any Company Property.

**Company Property** - Any Property owned by the Company.

**Default Interest Rate** - A rate of interest equal to Twelve Percent (12%).

**Distribution** - A transfer of Property to a Member or Assignee on account of a Membership Interest as described in Article 8.

**Disposition (Dispose)** - Any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or as an encumbrance (including dispositions by operation of law, e.g., dispositions in a merger or consolidation).

**Dissolution Event** - An event, the occurrence of which will result in the dissolution of the Company under Article 12.

**Effective Date** – 3 October , 2014, the effective date of the filing and acceptance of the Articles of Organization with the Secretary of State of Ohio.

**Initial Capital Contribution** - The Capital Contribution agreed to be made by the Initial Members as described in Article 7.

**Initial Members** - Those persons identified on **Exhibit A** attached hereto and made a part hereof by this reference who have executed the Agreement.

**Majority** - The affirmative vote or consent of Members described as a "Majority" in Article 5 hereof.

**Member** - Initial Member, Substitute Member or Additional Member.

**Membership Interest (or Interest)** - The rights of a Member or, in the case of an Assignee, the rights of the assigning Member in Distributions (liquidating or otherwise) and allocations of the profits, losses, income, gains, deductions and credits of the Company.

**Net Losses** - The losses and deductions of the Company determined in accordance with generally accepted accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company.

**Net Profits** - The income and gains of the Company determined in accordance with generally accepted accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company.

21

**Notice** - Notice shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Member in care of the Company at the address of the Principal Office. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at the address reflected in the Agreement unless the Member has given the Company a Notice of a different address.

**Organization** - A Person other than a natural person. Organization includes, without limitation, corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, trusts and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

**Organization Expenses** - Those expenses incurred in the organization of the Company including the costs of preparation of the Agreement and Articles.

**Person** - An individual, trust, estate or any incorporated or unincorporated organization permitted to be a member of a limited liability company under the laws of the State of Ohio.

**Principal Office** - The principal office of the Company as described in Article 2.

**Proceeding** - Any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator or governmental agency may enter a judgment, order, decree or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other Person subject to the jurisdiction of such court, arbitrator or governmental agency.

**Project** - The real estate development planned for that real property described in <u>Exhibit B</u> attached hereto and located in Cincinnati, Hamilton County, Ohio.

**Property** - Any property, real or personal, tangible or intangible, including money and any legal or equitable interest in such property but excluding services and promises to perform services in the future, and excluding any Membership Interest.

**Regulations** - Except where the context indicates otherwise, the permanent, temporary, proposed or proposed and temporary regulations of the Department of the Treasury under the Code as such regulations may be lawfully changed from time to time.

**Related Person** - A person having a relationship to a Member or Assignee that is described in §1.752-4(b) of the Regulations.

**Sharing Ratio** - With respect to any Member or Assignee, a fraction (expressed as a percentage), the numerator of which is the total of the Member's or Assignee's Capital Account and the denominator is the total of all Capital Accounts of all Members and Assignees. If calculated with respect to a period in which the Sharing Ratio changes, the Sharing Ratio for the entire period shall reflect the number of days at each Sharing Ratio. For the avoidance of doubt

22

and as an example only, if, with respect to a ten (10) day period, a Person's Sharing Ratio is ten percent (10%) for five (5) days and twenty percent (20%) for the other five (5) days, that Person's Sharing Ratio for the period would be fifteen percent (15%).

**Substitute Member** - An Assignee who has been admitted to all of the rights of membership pursuant to the Agreement.

**Taxable Year** - The taxable year of the Company as determined pursuant to §706 of the Code.

**Taxing Jurisdiction** - Any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's or Assignee's share of the income or gain attributable to the Company.

23

## EXHIBIT A

### Initial Capital

| Member | Contribution | Interest |
|---|---|---|
| Bair Properties, LLC<br>114 East 13th Street, Suite 1F<br>Cincinnati, Ohio 45202 | 8,000 | 40% |
| Kingston Development Group, LLC<br>2372 Madison Road, Unit W1C<br>Cincinnati, Ohio 45208 | 12,000 | 60% |

24

## EXHIBIT B

Legal Description of Real Estate and Description of Project

E-FILED 09/08/2017 04:08 PM  /  CONFIRMATION 656319  /  A 1704728  /  COMMON PLEAS DIVISION  /  IFI

## EXHIBIT C

Preliminary Proforma for the Project

26

E-FILED 09/08/2017 04:08 PM   /   CONFIRMATION 656319   /   A 1704728   /   COMMON PLEAS DIVISION   /   IFI